FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 MAR 24  PM 12: 06

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

MARGARET THERIOT                                    CIVIL ACTION

VERSUS                                              NO. 04-3049

JO ANN B. BARNHART                                  SECTION "J" (3)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Plaintiff, Margaret Theriot ("Theriot"), seeks judicial review of the final decision of the

Commissioner of the Social Security Administration (the "Commissioner"), denying her claim

for disability insurance benefits under the Social Security Act.  The Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  The United States District Judge, pursuant to 28 U.S.C. §

636(b), referred this case to the undersigned United States Magistrate Judge for review and

submission of a report and recommendation. Having reviewed the administrative record,

pleadings, the parties' cross motions for summary judgment and the applicable law,  the

undersigned United States Magistrate Judge finds that substantial evidence in the record supports

the decision of the Commissioner, and thus, recommends that the Defendant's motion be

GRANTED and that the Plaintiff's motion be DENIED for the following reasons.

1

Fee
Process
X Dktd
CtRmDep
Doc. No

# I. PROCEEDINGS

On November 8, 2002, the plaintiff filed an application for disability benefits.[1]  Plaintiff claimed inability to work since December 1, 1997 due to depression, seizure disorder, brain injury, herniated discs in back, neck injuries and visual disorders.[2]  Plaintiff's claim for benefits was denied initially and on reconsideration; thereafter, plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").[3]  On April 5, 2004,  ALJ Michael S. Hertzig conducted an evidentiary hearing in Metairie, Louisiana.[4]  Plaintiff  was represented by counsel at the hearing and Vocational Expert (VE) Thomas J. Meunier also appeared and testified.[5]  On June 22, 2004, ALJ Hertzig issued a written decision, finding that the plaintiff was not under a "disability" as defined by the Act at any time through December 31, 2001.[6]  As explained in more detail below, the ALJ determined based upon the testimony of the VE that the claimant could return to her past relevant work as a salesperson, a sales manager (as that job is performed in the national economy), and a director of admissions.[7]

---

[1] Application for Disability Insurance Benefits [Adm. Rec. 64-66].

[2] *See* Disability Report [Adm. Rec. 75].

[3] *See* Denial of Benefits dated February 5, 2003 [Adm. Rec. 31];  Request for Reconsideration dated March 23, 2003 [Adm. Rec. 40];  Denial of Benefits dated April 10, 2003 [Adm. Rec. 32]; Request for Hearing dated June 6, 2003 [Adm. Rec. 47].

[4] *See* Transcript of April 5, 2004 Administrative Hearing [Adm. Rec. 244-276].

[5] *See id.*; Resume of Thomas J. Meunier, Jr. [Adm. Rec. 55].

[6] *See* Decision of ALJ Michael S. Hertzig dated June 22, 2004 [Adm. Rec. 13-28].

[7] *Id.* [Adm. Rec. 26-27].

On August 20, 2004, plaintiff filed a Request for Review of the hearing decision.[8]  On September 17, 2004, the Appeals Council denied plaintiff's request for review of the hearing decision.[9]  The Appeals Council considered the plaintiff's contentions raised in her request for review, but concluded that they provided no basis under the applicable regulations for changing the ALJ's decision.[10]

On November 8, 2004, plaintiff filed this suit in federal district court seeking review of the final decision of the Commissioner.  Having exhausted all administrative remedies, this matter is ripe for review.

## II.  JUDICIAL REVIEW

### A. Standard of Review

The function of the court on judicial review of a denial of benefits is to determine whether "substantial evidence" supports the final decision and whether the Commissioner used the proper legal standards to evaluate the evidence.[11]  If the Commissioner's findings are supported by substantial evidence, they must be affirmed.[12]  "Substantial evidence" is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might

---

[8]*See* Request for Review of Hearing Decision dated August 20, 2004 [Adm. Rec. 8-9].

[9]*See* Action of Appeals Council dated September 17, 2004 [Adm. Rec. 4-6].

[10]*Id.*

[11]42 U.S.C. § 405(g); *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir. 2000); *Brown v. Apfel,* 192 F.3d 492, 496 (5th Cir. 1999).

[12]*Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

accept as adequate to support a conclusion.[13]   A district court may not try the issues *de novo*, re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if the district judge believes that the evidence weighs against the Commissioner's decision.[14] Nevertheless, the Court must carefully scrutinize the entire record to determine whether substantial evidence exists to support the ALJ's findings.[15]  "In short, conflicts in the evidence are for the Commissioner and not for the courts to resolve."[16]

If proper principles of law were applied, and if the Commissioner's decision is supported by substantial evidence, the findings are conclusive and must be affirmed.[17]

## B. Eligibility for Benefits under the Social Security Act

To qualify for Social Security income benefits, the plaintiff must meet the requirements set forth in the Social Security Act.[18]  Specifically, the plaintiff must be under age 65, file an application for benefits and be under a disability as defined by the Act.[19]  Those claiming benefits under the Act have the burden of showing the existence of disability.  Proof of the existence of a "severe" impairment alone does not establish "disability" within the meaning of the Act.

---

[13]*Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001); *Newton,* 209 F.3d at 452.

[14]*Masterson,* 309 F.3d at 272; *Newton,* 209 F.3d at 452.

[15]*Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied,* 514 U.S. 1120 (1995); *Anthony v. Sullivan,* 954 F.2d 289, 295 (5th Cir. 1992).

[16]*Masterson,* 309 F.3d at 272 (citations and internal alterations omitted).

[17]*See id.* (*citing Richardson,* 402 U.S. at 401)

[18]*See* 42 U.S.C. § 423(a) (2001).

[19]*See* 42 U.S.C. §§ 416(I), 423(a) (2001).

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months."[20] Therefore, a showing of general disability is insufficient; in addition, a claimant must prove the inability to engage in substantial gainful employment.

Establishment of "disability" is a dual process. First, the claimant must prove that she suffers from a medically determinable impairment.[21] Second, the claimant must prove that her impairment or combination of impairments render her unable to engage either in the work she previously performed or other substantial gainful employment that exists in the national economy.[22]

The Commissioner utilizes a five-step sequential evaluation to aid in the determination of whether a claimant is disabled.[23] A finding that the claimant is not disabled at any step is conclusive and ends the inquiry.[24] The five-step analysis was cogently restated in *Shave v. Apfel*:

> First, the claimant must not be presently working at any substantial gainful activity. Second, the claimant must have an impairment or combination of impairments that are severe. An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Third, the claimant's impairment must meet or equal an impairment listed in the appendix to the regulations. Fourth, the impairment must prevent the claimant from returning to his past relevant work. Fifth, the

---

[20] 42 U.S.C. § 423(d)(1)(A) (2001).

[21] 42 U.S.C. §§ 416(I)(1), 423(d)(1)(A) (2001).

[22] 42 U.S.C. §§ 416(I)(1), 423(d)(2) (2001).

[23] *Newton,* 209 F.3d at 453 (5th Cir. 2000).

[24] *Watson,* 309 F.3d at 272; *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995).

impairment must prevent the claimant doing any relevant work, considering the claimant's residual functional capacity, age, education, and past work experience. At steps one through four, the burden of proof rests upon the claimant to show he is disabled.  If the claimant acquits this responsibility, at step five the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments.  If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work.[25]

In conjunction with steps four and five, the Commissioner utilizes a "residual functional capacity (RFC) assessment to determine whether the applicant, notwithstanding severe impairment, has the physical and mental ability to perform work-related activities on a regular and continuing basis as generally required by competitive, remunerative work.[26]  Thereafter, the Commissioner determines if the claimant has the physical and mental ability to perform his past relevant work.[27]  If the claimant's RFC meets or exceeds the requirements of her regular previous employment, the disability claim is denied.[28]  If not, the inquiry proceeds to step 5 where the Commissioner has the burden to show that the claimant can do work as it is generally performed in the national economy.[29]

---

[25]*Shave v. Apfel*, 238 F.3d 592, 593 (5th Cir. 2001).

[26]RFC is defined as "what you can still do despite your limitations" and has three components, to wit: physical abilities, mental abilities, and other abilities affected by impairments.  20 C.F.R. § 404.1545(a) (2002); Soc. Sec. Ruling 96-8p, 61 F.R. 34474 (July 2, 1996).

[27]*See Chaparro v. Bowen,* 815 F.2d 1008, 1010 (5th Cir. 1987).

[28]*See* 20 C.F.R. § 404.1561 (2002).

[29]*See* 20 C.F.R. § 404.1566 (2002).

6

### III. ASSIGNMENTS OF ERROR

Plaintiff's assignments of error are that the ALJ allegedly failed to give proper weight to the plaintiff's treating orthopedist and neurologist (Drs. Rauchwerk and Wilensky), completely disregarded plaintiff's testimony and erroneously refused to reopen the case to admit the testimony of two lay witnesses (plaintiff's current and former spouses), which testimony would be offered to corroborate the plaintiff's allegations that she suffered from "severe" depression, *inter alia.*

The Commissioner argues that the final decision is supported by substantial evidence. Defendant contends that the ALJ's determination that claimant's depression was not "severe" was substantially correct since the actual medical evidence of clinical depression is scant. The Commissioner further argues that the only treating physician who found the plaintiff disabled was Brent Carr, whose opinion ("a mental residual functional capacity 'check-box' form [submitted] on October 10, 2002 at the request of plaintiff's attorney")[30] was properly discredited.[31] Regarding the plaintiff's anxiety/depression, the Government highlights that the

---

[30]*See* Commissioner's Memorandum in Support of Cross-Motion for Summary Judgment at p.6.

[31]The Court notes that Government's argument in this regard bears no resemblance to the administrative record filed in Theriot's social security case. According to the administrative record, plaintiff was never treated by Dr. Brent Carr, there is no mental RFC form submitted by the aforesaid physician contained in the record and the report described in the Government's memorandum in support of cross-motion for summary judgment as a "check-box" form RFC was not mentioned by the ALJ. Additionally, the Commissioner's argument describing a second modified hypothetical question pursuant to which the VE testified that plaintiff could perform her past work as a bartender also bears no resemblance to the administrative record filed in this case. For that reason, the Court dismisses these arguments as meritless at the outset without any further discussion.

7

conditions were not aggressively treated,[32] were usually noted by way of history and appear to be

situational.[33] In addition, other evidence of record from treating sources weighs against a finding

of "severe" depression.[34] Moreover, the Commissioner contends the ALJ's credibility

determination is supported by objective evidence of record and thus is entitled to deference.[35]

Finally, the Commissioner notes that the ALJ's RFC assessment actually credited plaintiff's

testimony in part in that the ALJ agreed with the restriction that plaintiff should avoid engaging

in work activity that involved the operation of vehicles, notwithstanding the fact that plaintiff

retains a valid driver's license with no restrictions and continues to drive despite her seizure

---

[32]*See* Dr. Michael Wilensky's Report dated May 15, 2002 (noting anxiety/depression but stating that the patient "has not seen a psychiatrist as previously recommended") [Adm. Rec. 158]; Dr. Joseph L Palotta's letter dated December 31, 2002 (noting that he had treated for a six month period between October 1, 1996 and April 15, 1997 and *had* Major Depressive Disorder which *did* affect her ability to function, however her last visit was more than five years ago) [Adm. Rec. 166].

[33]*See* EJGH Emergency Room Records dated December 1, 1996 (noting that plaintiff was upset because her husband left her and advising her to follow up with Alcoholic Anonymous for support as she adjusts to marital changes) [Adm. Rec. 116-120]; EJGH Discharge Summary dated January 31, 1997 (diagnosing substance abuse/substance abuse induced mood disorder, noting that patient was anxious and upset because she was recently served divorce papers and that she "completed detox without difficulty and was discharged") [Adm. Rec. 108].

[34]*See* Orleans Orthopaedic Associates' Records dated November 4, 2003 (noting the patient's general health is good, normal activity level and energy level, no loss of appetite, no major weight loss or gain, no malaise, patient oriented X 3and in no acute distress, walks with normal gait, shows good judgment and "demonstrates *no* anxiety or depression") [Adm. Rec. 225]; Crosby Memorial Medical Records dated October 21, 2001, January 18, 2002, September 12, 2002 (noting patient's mental status of alert and oriented, coherent speech and/or all systems normal except musculoskeletal) [Adm. Rec. 133, 135, 138, 142, 143, 144]; Dr. Adatto's treatment records dated November 1, 2001 (noting that the plaintiff is a self-employed artist, "is able to do her job" and "is in fairly good health overall") [Adm. Rec. 130].

[35]*See* Defendant's Memorandum in Support of Cross-Motion for Summary Judgment at pp. 6-7.

condition.[36]

## IV. EVIDENTIARY RECORD

### A. Administrative Hearing

Born on July 13, 1949, plaintiff was 54 years old at the time of the hearing, with three

years of college and past relevant work experience as a sales person, sales manager and a director

of admissions.[37]   Theriot testified that she had last worked in October of 1997 as a telemarketer.[38]

Plaintiff 's counsel clarified that the plaintiff had a previously filed application for disability

benefits denied on July 31, 2001 and that there was no appeal of that determination.[39]   The ALJ

noted for the record that plaintiff's insured status expired on December 31, 2001 and that most of

plaintiff's treatment records pertain to injuries sustained in the May, 2002 automobile accident.[40]

Turning back to her work history, plaintiff testified that nearly every company she worked

for eventually moved her up into sales management because she was well-versed in generating

leads and training people to take leads and close them.[41]   Additionally, plaintiff had experience

working as director of admissions for Phillips College, Coastal College (trucking school) and

Crescent City Tech.[42]

---

[36]*See* Transcript of the April 5, 2004 Hearing [Adm. Rec. 259-261].

[37]*Id.* at 254, 256-257.

[38]*Id.* at 254, 262.

[39]*Id.* at 255.

[40]*Id.* at 251.

[41]*Id.* at 256-257.

[42]*Id.* at 257.

Theriot testified that she had been in three automobile accidents, was the driver in all three and was not certified to drive under Mississippi law for the last two. Additionally, Plaintiff did not dispute the fact that Dr. Wilenski told her not drive on February 13, 2002.[43] Plaintiff admitted that she continued to drive despite the fact that she had two abnormal EEG tests.

Plaintiff further testified that, prior to the September, 2001 automobile accident, she was "getting back on [her] feet" (i.e., "felt more upbeat" and "more positive"). She had remarried and "had a life."[44] However, plaintiff testified that, after the accident, "everything ached."[45] Regarding her daily activities, plaintiff stated that she could walk for short distances and that would ease the pain but that, if she walked more than an eighth of a mile, the pain would increase. Theriot testified that her only comfortable position was sitting in a crouched manner.[46]

Plaintiff testified that, after a few months, she adjusted to her pain medications. Theriot indicated that her neurologist, Dr. Wilenski, prescribed Trileptal and Klonopin which eased her seizure symptoms.[47] Plaintiff reported that she is currently treated by Dr. Wilensky and Dr. Watermeier. Plaintiff indicated that she did not feel capable of working because she suffers constant back and neck pain and was only comfortable in a stooping position.[48]

The ALJ specifically discounted the plaintiff's allegations of *disabling* symptoms and

---

[43]Hearing Transcript [Adm. Rec. 260].

[44]*Id.* at 263.

[45]*Id.* at 265.

[46]*Id.*

[47]*Id.* at 267-268.

[48]*Id.* at 269.

limitations, noting that her testimony included contradictory statements and was inconsistent

with objective medical evidence, which did not establish the existence of disabling limitations on

or before December 31, 2001. The ALJ explained his findings in this regard as follows:

> Ms. Theriot said that, in the accident of September of 2001, she was going 55-60
> miles per hour. A car behind her was going very fast and slipped into traffic. An
> off-road vehicle hit her car from behind and totaled her vehicle. She was not
> cited. At first she did not think that she had problems. She took X-rays and went
> outside to smoke. She passed out and had a concussion. Everything hurt. She
> had an MRI of her back. It showed a herniated disc and desiccated disc. Her neck
> hurt. On a daily basis, she could walk for a little while. Her pain would ease. A
> comfortable position was to crouch down. It was not comfortable for her to sit or
> stand. She was on pain medication, but she adapted to it after 3 months.

> As to her mental state, the claimant said that she was having family problems at
> the time. She walked in the freezing cold. She had no telephone. She had
> difficulty with concentration; she is still suffering from falling asleep. She falls
> asleep while cooking; this occurs daily. She is on Trileptal and Klonopin. They
> did help at first. She has not had as many seizures, but she is still having petit mal
> seizures daily.

> The undersigned finds that through December 31, 2001, the claimant had no
> exertional limitations on her residual functional capacity. She could never climb
> or balance. She could not be exposed to heights or moving machinery.

> The claimant's allegations regarding her limitations through December 31, 2001,
> are not entirely consistent with the medical evidence of record and are not
> completely credible. The claimant testified that she has trouble with
> concentration and still falls asleep every day. On December 5, 2001, she
> complained to Dr. Wilensky of inappropriately falling asleep, but she told Dr.
> Wilensky that the excess sleepiness had resolved 2-3 weeks before she saw him.
> Dr. Wilensky also noted that the claimant was alert, verbal and coherent.

> None of the doctors who saw claimant before December 31, 2001 make any
> observation that the claimant had any difficulty concentrating and she did not
> complain to them of any such difficulty.

> In her disability report, the claimant alleged that she had multiple herniated discs.
> The MRI's of November 21, 2001, showed that the claimant had one small disc
> herniation at L4-5. The claimant's treating orthopedists consistently indicated
> well into 2002 that the claimant was capable of working. The claimant indicated

in her disability report that she has visual problems. She wrote in her letter to Dr. Wilensky that she had not begun to have visual problems until after her second motor vehicle accident in May of 2002.

\*    \*    \*

(9) The claimant was not under a "disability" as defined in the Social Security Act at any time through December 31, 2001.[49]

(10) As the claimant was not disabled at any time though December 31, 2001, she is not entitled to a period of disability or Disability Insurance Benefits based upon her application of November 15, 2002.[50]

Having studied Theriot's vocational background and having heard the testimony of the plaintiff, Vocational Expert (VE) Thomas Meunier, Jr. testified that plaintiff was still capable of performing her past relevant work as a salesperson, a sales manager (as the job is performed in the national economy), and a director of admissions. Based upon the testimony of the impartial vocational expert, the ALJ determined that Theriot was capable of returning to her past relevant work and was therefore not under a disability as defined in the Social Security Act at any time through December 31, 2001.[51]

### B. Medical History

Theriot argues that the "quixotic statement" (namely "regular work"), which appears throughout Dr. Rauchwerk's medical records, is "unexplainable and cannot be the basis of negating the doctor's physical findings and opinion of disability." Nevertheless, the plaintiff

---

[49]Theriot met the non-disability requirements set forth in Section 216 of the Social Security Act and was insured for Disability Insurance Benefits *only through December 31, 2001*. Therefore, in order to be entitled to a period of disability and Disability Insurance Benefits, she had to establish disability on or prior to December 31, 2001.

[50]ALJ Hertzig's Decision dated June 22, 2004 [Adm. Rec. 27]

[51]*Id.* [Adm. Rec. 26].

12

does not dispute the ALJ's recapitulation of her medical history.  Accordingly, his thorough

analysis (which is substantially correct) is incorporated by reference and reiterated below, to wit:

> The claimant was seen at Crosby Memorial Hospital on October 21, for
> complaints of pain in the left side of her neck and shoulder pain.  She said that she
> had been involved in a motor vehicle accident on September 27, 2001.  Her pain
> had become worse in the last few days.  The patient was ambulatory and walked
> to an examination room with a steady gait.  When the physician examined her, she
> said that her pain was radiating down her left arm.  She was oriented and in no
> acute distress.  Her neck was supple, with tenderness on the left side.  She was
> diagnosed with cervical strain and prescribed Motrin, Flexeril and Darvocet.  She
> was discharged in stable condition to return home.  She was told to contact Dr.
> Whitecloud, a neurological surgeon. (Exhibit 3F, pp. 10-14).

> On October 1, 2001, the claimant was seen by Dr. Kenneth Adatto, an orthopedic
> surgeon at The Louisiana Clinic (TLC).  She told Dr. Adatto that she had been
> involved in a motor vehicle accident about a month earlier.  She had been seen at
> a local hospital after the accident and treated and released.  Dr. Adatto was the
> first doctor to see her since her accident.

> The claimant complained of low back pain that was constant and moderate to
> severe.  She had aching and cramping pain that went down her hip and thigh.  Her
> numbness seemed to be increasing.  She complained of pain in her feet and
> bilateral leg weakness.  Her pain was not affected by coughing or sneezing, but it
> increased by standing or sitting.   It was decreased by bending and lying down.

> The claimant denied any treatment or her neck and back before her accident or
> since.  She was in fairly good health overall.

> On examination of her neck, the claimant had spasm only at stress, without tilt
> and scoliosis.  She had limited motion in her cervical spine.  She had no
> tenderness in the cervical musculature.  She had full range of motion of her upper
> extremities.  Deep tendon reflexes were equal and active.  Motor, power and
> sensation were active in both upper extremities.  Cranial nerves functioned
> normally.  There was symmetrical muscle development bilaterally.  Pulses were
> present and symmetrical in both upper extremities.

> On examination of her dorsal spine, the claimant stood erect with no scoliosis or
> increase in dorsal kyphosis.  The muscles were soft and there was no muscle
> spasm.  She had normal lateral and rotary motion without discomfort.

> In her lumbar spine, the claimant had spasm at stress with reversal of the normal

lumbar lordosis on forward flexion.  Trendelenburg's tests were normal bilaterally.  The claimant was able to walk on her heels and her toes unaided.  Her deep tendon reflexes were equal and active.  Motor, power and sensation were intact bilaterally and her leg lengths were equal.  She had symmetrical muscle development in her lower extremities.  Pulses were present and bilaterally symmetrical and Dr. Adatto felt that they were normal.

X-rays of the claimant's cervical spine showed narrowing at C5-6 and C6-7 with concomitant spurs.  X-rays of her lumbar spine showed mild arthritis with spurs present from L3 to L5 anteriorly.  There was mild disc space narrowing at L4-5 and L5-S1.

Dr. Adatto opined that the claimant had mild arthritis that had been aggravated by her accident.  He recommended Celebrex, Norflex and Elavil.  The claimant was given neck and back care booklets.  Dr. Adatto again said that she should see a neurologist for a headache workup.  He diagnosed her with cervical and lumbar sprains/strains.

Dr. Adatto stated that the claimant's disability status was regular work.[52]

On November 7, 2001, the claimant was seen by Dr. Joseph Rauchwerk at [The Louisiana Clinic] TLC.  She complained of terrible neck, back and leg pain.  She wanted stronger medication.  She said that she had been given Lortab and Xanax at the hospital emergency room, so Dr. Rauchwerk said that he would give her those.

Dr. Rauchwerk diagnosed the claimant with neck and back pain superimposed on pre-existing spondylosis and probable lumbar disc derangement.  He ordered MRI's of her cervical and lumbar spine. [Adm. Rec. 129]

On November 21, 2001, MRI's of the claimant's lumbar and cervical spine were performed at TLC.  The lumbar spine MRI showed disc dessication but a normal axial contour at L5-S1, and disc dessication at L4-5 with a small, subtle right herniation projecting into the right neural foramen.  The cervical spine MRI showed mild central spurring at C2-3 and C3-4; mild hypertrophic ridging at C4-5 consistent with cervical spondylosis; moderate hypertrophic ridging and a diffuse annular bulge at C5-6; and uncospurring at C6-7 consistent with spondylosis. [Adm. Rec. 122, 123]

---

[52]See Dr. Adatto's Clinic Notes dated November 1, 2001 (specifically noting that claimant "is able to do her job" which explains The Louisiana Clinic  notation as to disability status throughout their records on the Theriot, i.e., "regular work") [Adm. Rec. 130, 131].

Also on November 21, 2001, Dr. Rauchwerk saw claimant again and reviewed her MRI's. He said that the claimant continued to complain of lumbosacral pain with anterior and posterior right leg pain. She complained of upper extremity pain with numbness and tingling in her hands. Dr. Rauchwerk observed that the claimant was to have a neurological consultation on December 7, 2001.[53]

On examination, the claimant had a 50% or less range of motion with moderate tenderness and spasm in the cervical paraspinal and the trapezius muscle groups. She had pain into her neck and shoulders with shoulder abduction. She had full range of motion in her shoulders with no pain across the shoulders. Her reflexes were equal and intact. Strength was equal and intact in grip and upper extremities. There was no sensory loss in the claimant's upper extremities. The functions of cranial nerves II-XII were grossly intact. The claimant had positive Tinel's signs bilaterally.

Dr. Rauchwerk diagnosed the claimant with carpal tunnel syndrome, cervical spondylosis, lumbar degenerative disc disease and lumbar disc derangement. Dr. Rauchwerk said that he had requested EMG/nerve conduction studies of the claimant's upper extremities. She was given prescriptions for bilateral wrist splints and physical therapy for her neck and low back. Dr. Rauchwerk renewed her medications. He again stated that her disability status was for regular work.[54]

On December 5, 2001, Dr. Michael Wilensky performed a neurological evaluation of the claimant. The claimant told Dr. Wilensky that on September 27, 2001, her vehicle was rear-ended by a truck traveling 90 miles per hour.[55] She said that she had hit her head, but had not lost consciousness. She had a questionable concussion. She complained of mild dizzy spells, pain in her neck and left arm and inappropriately falling asleep. She stated that her excessive sleepiness had resolved two to three weeks before she saw Dr. Wilensky. She said that she had had an MRI of her lumbar spine that showed a ruptured disc. She stated that she also had a history of trigeminal neuralgia.

---

[53]See Dr. Rauchwerk/The Louisiana Clinic Notes dated November 21, 2001 [Adm. Rec. 124].

[54]See The Louisiana Clinic/Dr. Rauchwerk's notes dated November 21, 2001 (noting "Disability Status: Regular Work") [Adm. Rec. 124]. See also The Louisiana Clinic/Dr. Watermeier's notes dated October 16, 2002 (also noting "Disability Status: Regular Work as tolerated) [Adm. Rec. 125].

[55]See Crosby Memorial Hospital Emergency Room Records dated October 21, 2001 (noting "patient in motor vehicle accident on September 27, 2001" and "all systems normal except as noted," i.e., "neck and left arm pain") [Adm. Rec. 141-143].

Ms. Theriot said that she was currently taking Klonopin, Loracet and Celebrex. She said that she smoked ½ pack per day and drank alcohol occasionally. On examination, the claimant was alert, attentive, verbal and coherent. She was in no acute distress. Her cranial nerve functions were unremarkable. Her sensation to pinprick and vibration was normal. Her deep tendon reflexes in her upper and lower extremities were 2+ and bilaterally symmetrical. Both plantar reflexes were flexor. Cerebellar examination was normal. The claimant's gait was slightly unsteady; Romberg's sign was normal. Her tandem gait was normal. She had full range of motion of her neck with no cervical tenderness. Examination of her low back was negative. She had no involuntary movements.[56]

Dr. Wilensky's impression was that the claimant had a closed head injury. He thought that she had post concussion syndrome, rule out seizure disorder, and anxiety and depression. He recommend an EEG (electroencephalogram).[57]

On December 27, 2001, the claimant was seen by Dr. John Watermeier at TLC. The claimant complained of continuing pain in her back and weakness of the left extensors and anterior tibialis. She was having more leg than back pain.

On examination of her lumbar spine, the claimant had moderate tenderness and mild to moderate muscle spasm with a decrease in the lordotic curve. She was limited to 40-50% forward flexion, backward extension and lateral rotation. She had moderate pain in sitting and supine straight leg raising at 45 degrees. Her distal pulses were palpable. Her Achilles and patellar reflexes were hypoactive and bilaterally equal. She had fair extensor muscle tone with no evidence of sensory deficit. She had moderate tenderness over her sacroiliac joints.

Dr. Watermeier diagnosed the claimant with lumbar disc syndrome. He said that he had discussed endoscopic lumbar surgery with her. He renewed her prescriptions for pain medication and increased the frequency of her dosage to three times a day. She was to see Dr. Rauchwerk again on her return visit.

Dr. Watermeier also indicated that the claimant's disability status was for regular work. [Adm. Rec. 129]

It does not appear that the claimant was seen again by any of her treating physicians before December 31, 2001, when her coverage for Disability Insurance Benefits expired.

---

[56]*See* Dr. Wilensky's Neurological Evaluation dated December 5, 2001 [Adm. Rec. 161].

[57]*Id.*

16

On February 26, 2002, the claimant saw Dr. Watermeier at TLC again. She continued to complain of pain, primarily in her low back and both hips and legs. She described her pain as occurring daily and being moderate to intense. Ameliorating factors included rest and lying down; aggravating factors included standing and walking.

On examination, the claimant walked with a normal gait and did not use a cane or crutches. Her spine was stable to palpation. In her lumbar spine, she had no spasm, tilt or scoliosis. She had a full range of motion and her lumbar lordosis was reversed on forward flexion. She recovered well to the upright position. Trendelburg tests were negative bilaterally. Deep tendon reflexes were equal and active in her lower extremities. She was able to walk on heels and toes unaided. Her leg lengths were equal. She had symmetrical muscular development in her lower extremities. Pulses were present and within normal limits.[58]

Dr. Watermeier discussed epidural steroid injections with the claimant. He renewed her prescriptions for pain medication. He diagnosed her with lumbar disc syndrome and indicated that her disability status was for regular work.

On February 13, 2002, Dr. Wilensky performed an EEG on the claimant. The EEG was abnormal, showing evidence of left temporal slowing and occasional sharp wave. Photic stimulation and hyperventilation did not significantly alter the recording. Dr. Wilensky observed that clinical correlation should be made to rule out structural lesion in this part of the brain.[59]

On April 23, 2002, Dr. Watermeier saw the claimant at TLC again. She continued to have intermittent symptoms. Her pain was moderate.

Dr. Watermeier said in the review of systems that the claimant had a normal gait. She did not have a limp. She did not use a cane or crutch for assistance. She did not use a sling, collar or splint for her upper extremities. Her spine was stable to palpation.[60]

The claimant's cervical spine had mild muscle tenderness and moderate muscle spasm. Her range of motion was limited to 50% in forward flexion, backward

---

[58]See The Louisiana Clinic/Dr. Watermeier's notes dated February 26, 2002 (noting disability status of "regular work") [Adm. Rec. 128].

[59]See Dr. Wilensky's EEG Report dated February 13, 2002 [Adm. Rec. 136].

[60]See The Louisiana Clinic/Dr. Watermeier's notes dated April 23, 2002 [Adm. Rec. 128].

extension and lateral rotation. She had moderate pain on axial compression. Deep tendon reflexes biceps, triceps and brachioradialis were hypoactive but equal. Grip strength was fair bilaterally. There was no evidence of sensory deficit. She had full ranges of motion in both shoulders with mild pain. Sensation was intact.

Examination of her lumbar spine showed a normal lordotic curve. She had mild tenderness to palpation of her lumbar spine and mild evidence of muscle spasm. Mobility of her lumbar spine was 75-80% in forward flexion, backward extension and lateral rotation. She was able to walk on her heels and toes without difficulty. Straight leg raising was mildly uncomfortable bilaterally in both sitting and supine positions. Distal pulses were palpable. Deep tendon reflexes of the patellas and Achilles tendons were 2+ and equal. There was good extensor muscle tone and no evidence of sensory deficit. There was mild tenderness over the sacroiliac joint. X-rays were not taken.

Dr. Watermeier diagnosed the claimant with cervical and lumbar disc syndrome. He said that treatment would include prescription medications, periodic review and observation. He said that surgery was not recommended and that trigger point injections were not given. He stated that diagnostic tests and/or consultation were not needed. He opined that the claimant's prognosis was fair and indicated that her disability status was for regular work.[61]

On July 24, 2002, an MRI of the claimant's brain was done for Dr. Wilensky. The MRI showed minimal cerebral atrophy general consistent with age, a deep white matter T2 hyperintensity in the right frontal lobe felt to represent an area of gliosis and/or small vessel disease, and no specific brain abnormality.[62]

On April 5, 2003, Dr. Wilensky recorded a follow-up note concerning the claimant. He said that the claimant had written a letter to him concerning some details of her history. He said:

> Her first accident on 9/27/01 was responsible for ruptured discs in her back. She states that she did not have a significant head injury at that time with no loss of consciousness. *After the second accident 5/5/02 she sustained head injury with loss of vision in the right eye. Since the second accident patient has complained of loss of balance and coordination, loss of*

---

[61]*Id.* [Adm. Rec. 127-128].

[62]*See* MRI Report of Dr. H. Denny Taylor dated July 24, 2002 [Adm. Rec. 152-153].

*appetite, visual problems and her seizure disorder.*[63]

On March 31, 2004, Dr. Wilensky wrote a letter on behalf of the claimant, stating that in his opinion, she is totally disabled for multiple medical/neurological reasons. (Exhibit 14F).[64] Among the reasons Dr. Wilensky stated for his conclusion was that the claimant had headaches, post-concussion syndrome secondary to a closed head injury, seizure disorder and anxiety/depression. As Dr. Wilensky indicated in the note quoted above, the claimant's alleged vision problems, balance problems and loss of coordination post-dated her accident of May 5, 2002. Therefore, Dr. Wilensky's conclusion that the claimant is disabled for the reasons that he stated is not relevant to the determination of her disability status before December 31, 2001.[65]

### C. ALJ's Findings

In the instant case, the ALJ proceeded to step four of the sequential evaluation analysis, and found that the plaintiff was capable of returning to her past relevant work, to wit:

1. The claimant met the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and was insured for benefits only through December 31, 2001.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has a seizure disorder and a substance abuse dependency disorder. These are severe impairments within the meaning of *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985) and the Regulations.

4. Through December 31, 2001, the claimant had no impairment or combination of impairments that met the criteria of any of the impairments listed in the Listing of Impairments, Appendix 1, Subpart P, Regulations No. 4. No treating or examining physician mentioned findings equivalent in severity to the criteria of any listed impairment.

---

[63]*See* Dr. Wilenski's Neurology Follow Up Note dated April 15, 2003 (noting that plaintiff had a seizure a few weeks ago when she ran out of Klonopin) (italicized emphasis added by ALJ) [Adm. Rec. 203].

[64]*See* Dr. Wilensky's correspondence dated March 31, 2004 [Adm. Rec. 213].

[65]*See* ALJ Michael Hertzig's Decision dated June 22, 2004 [Adm. Rec. 16-22].

5. The undersigned finds that the claimant's allegations regarding her limitations through December 31, 2001, are not totally credible for the reasons set forth in the body of the decision.

6. Through December 31, 2001, the claimant had no exertional limitations on her residual functional capacity.  She could never climb or balance.  She could not be exposed to heights and moving machinery.

7. The claimant's past relevant work as a salesperson, sales manager and director of admissions did not require the performance of work-related activities precluded by her residual functional capacity through December 31, 2001.  (20 CFR 404.1565).

8. Through December 31, 2001, the claimant's medically determinable seizure disorder, substance abuse and dependency disorder and herniated nucleus pulposus did not prevent her from performing her past relevant work.

9. The claimant was not under a "disability" as defined by the Social Security Act at any time through December 31, 2001. (20 CFR 404.1520(f)).

10. As the claimant was not disabled at any time through December 31, 2001, she is not entitled to a period of disability or Disability Insurance Benefits based upon her application of November 15, 2002.[66]

The ALJ specifically stated that Theriot failed to meet Listing 1.02, noting that the claimant had no impairment of a major peripheral weight bearing joint  and was not unable to ambulate effectively.  As to the upper extremities, the ALJ correctly noted that there is no evidence that the claimant had any deficiencies in her ability to reach, push, pull, grasp or finger and, on the date that Dr. Rauchwerk diagnosed a carpal tunnel syndrome, he further noted normal grip and upper extremity strength and also noted that her disability status was regular work.[67]

---

[66]*See* ALJ Hertzig's Decision [Adm. Rec. 26-27].

[67]*Id.* [Adm. Rec. 22].

20

As to Listing 1.04, the ALJ noted the absence of evidence of arachnoiditis, pseudoclaudication or nerve root impairment sufficient to meet the criteria of the listing. Additionally, the ALJ highlighted the absence of evidence of atrophy at any time. Additionally, the medical evidence failed to establish that the plaintiff met the requirements of Listing 1.08, since plaintiff did not undergo any surgical procedures prior to December 31, 2001 and thus could not have undergone any treatments related to surgery.[68]

The ALJ further explained, that at all times prior to her May, 2002 motor vehicle accident, claimant's treating orthopedists opined that the plaintiff was capable of her "regular work" and, despite the diagnosis of lumbar syndrome treated with pain medications, did not suggest any physical limitations that would prevent Theriot from working.[69]

The ALJ further noted that the plaintiff was hospitalized for a mental breakdown in 1997 and was then diagnosed with alcoholism. Nevertheless, plaintiff herself admitted that her mental condition thereafter up to September of 2001 was upbeat and positive and that she had gotten married.[70]    ALJ Hertzig further observed that, in December of 2001, plaintiff reported to Dr. Wilensky that her excess sleepiness had resolved and that Dr. Wilensky noted that the claimant was alert, verbal and coherent. Moreover, none of plaintiff's other treating physicians noted that Theriot had any difficulty concentrating and she did not complain to them of any such difficulty.[71]

---

[68]*Id.* [Adm. Rec. 22-23].

[69]*Id.*

[70]*Id.* [Adm. Rec. 24-25].

[71]*Id.* [Adm. Rec. 25].

# V. ANALYSIS

The plaintiff has alleged that the ALJ committed error in several respects: (1) according improper weight to her treating physician's (Dr. Rauchwerk's) alleged cryptic statements, *i.e.*, "Disability Status: Regular Work;" (2) failing to give controlling weight to Dr. Wilensky's findings and opinion that he was totally disabled due to multiple medical/neurologic problems; (3) failing to give due credit to plaintiff's testimony that she had completely overcome her alcohol problem but remained greatly depressed; and (4) failing to reopen the record to take the lay testimony of Theriot's spouse and former spouse, who would corroborate the plaintiff's testimony regarding her emotional state/depression.  Plaintiff's assignments of error are addressed serially below.

## A. Treating Source's Statements and Determinations

Ordinarily, the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment and responses should be accorded considerable or great weight in determining disability.[72]  The ALJ may assign less weight to a treating physician's opinion when there is good cause shown to the contrary.  "A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence."[73]  The opinion of a specialist is generally accorded greater weight than a non-specialist.[74]

---

[72]*See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000); *Newton*, 209 F.3d at 455.

[73]*Newton*, 209 F.3d at 455 (citations and inner alterations omitted).

[74]*Id. (citing Paul v. Shalala,* 29 F.3d 208 211 (5th Cir. 1994).

22

The ALJ is not at liberty to reject a medical opinion without giving an explanation and is not at liberty to make a medical judgment regarding the ability or the disability of a claimant to engage in gainful activity where such inference is not warranted by clinical findings.[75] Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.[76] Treating physicians' opinions are not conclusive regarding matters reserved to the Commissioner.[77]   Good cause may permit the ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by clinical findings, or is otherwise unsupported by the evidence.[78]

As restated by the Fifth Circuit in *Newton*:

SSA Regulations provide that the SSA "will always give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion" and list factors an ALJ must consider to assess the weight to be given to the opinion of a treating physician when the ALJ determines that it is not entitled to "controlling weight." See 20 C.F.R. § 404.1527(d)(2). Specifically, this regulation requires consideration of:
(1) the physician's length of treatment of the claimant,
(2) the physician's frequency of examination,
(3) the nature and extent of the treatment relationship,
(4) the support of the physician's opinion afforded by the medical evidence of record,
(5) the consistency of the opinion with the record as a whole; and
(6) the specialization of the treating physician.
The regulation is construed in Social Security Ruling ("SSR") 96-2p, which states:
[A] finding that a treating source medical opinion is not well supported by

---

[75]*Loza*, 219 F.3d at 395.

[76]*Newton*, 209 F.3d at 456.

[77]*Id.* (*citing Brown*, 192 F.3d at 500).

[78]*Id.*

medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.[79]

The Fifth Circuit requires that an ALJ consider each of the § 404.1527(d) factors before declining to give any weight to the opinion of the plaintiff's treating specialists.[80]  It is clear that the ALJ performed the appropriate analysis with respect to the plaintiff's treating physicians' assessments that Theriot retained the functional capacity perform to her regular occupation prior to the expiration of her disability insured status (December 31, 2001).  In this regard, the ALJ relied collectively on plaintiff's treating specialists' (Drs. Adatto, Watermeier, Rauchwerk and Wilensky) reports and conclusions, which did not conflict in any significant aspect regarding the plaintiff's condition prior to December 31, 2001.  To the extent that it can be argued that there is conflicting evidence, it is the responsibility of the ALJ, not the court, to resolve conflicts in the evidence.[81]

Regarding the plaintiff's mental status, this case falls outside of the ambit of the rule of *Newton, supra.* As aforestated, this case involves *competing first-hand medical evidence.*[82]  The only treating physician of record to find the plaintiff disabled was Dr. Wilensky; however, his

---

[79]*Newton,* 209 F.3d at 456.

[80]*Id.*

[81]*Martinez,* 64 F.3d at 174.

[82]*See* Notes 32, 33 and 34, *supra* (highlighting medical evidence noting that plaintiff is capable of performing her "regular work").

24

opinion clearly related to the time period post-dating December 31, 2001.[83]   ALJ Hertzig

considered and rejected Dr. Wilensky's March 31, 2004 conclusion (total disability), explaining

in detail that the aforesaid  opinion was not relevant to Theriot's disability status prior to

December 31, 2001.[84]

The ALJ fully discussed the permutations of the *superficially* conflicting medical reports,

The ALJ  notes that substantial medical evidence indicates that, as of January of 2002, plaintiff

appeared to be doing well.[85]   Moreover, plaintiff's depression/anxiety was reported by way of

history and remained untreated during the entirety of pertinent time frame (prior to December 31,

2001) and thereafter.[86]   Finally, it is not disputed that plaintiff  had fully recovered from

---

[83]*See* Dr. Wilensky's opinion dated March 31, 2004 (concluding that the patient was
totally disabled for multiple medical/neurologic problems including abnormal MRI brain scan)
[Adm. Rec. 213]. *But see* Report of MRI Brain Scan dated July 24, 2002 (noting "no specific
brain abnormality") [Adm. Rec. 152].

[84]*See* ALJ Hertzig's Decision (noting that Dr. Wilensky's decision finding disability was
predicated upon headaches, post-concussion syndrome, seizure disorder, vision, balance and loss
of coordination post-dating her accident of May 5, 2002) [Adm. Rec. 22].

[85]*See* Report of Dr. Wilensky dated December 5, 2001 (noting that "[t]his is an alert,
attentive, verbal/coherent female who is in no acute distress") [Adm. Rec. 161/199]; Neurology
Follow-Up Report of Dr. Wilensky dated April 15, 2003 (noting no significant head injury or
loss of consciousness at the time of her first accident and that, only after the second accident
(May 5, 2002) did she sustain head injury, vision problems, seizure disorder) [Adm. Rec. 203];
Neurology Follow-Up Report of Dr. Wilensky dated May 15, 2002 (noting that plaintiff
sustained a head injury in accident of May 5, 2002) [Adm. Rec. 206]; Dr. Watermeier's Report
dated November 11, 2003 (specifically noting "normal activity level and energy level, no loss of
appetite, not major weight loss or gain, no malaise" and "patient well oriented to time place and
person," "in no apparent acute distress," "responds to questioning with good judgment" and
"demonstrates *no anxiety or depression*") [Adm. Rec. 225].

[86]*See* Report of Dr. Joseph Palotta (Psychiatrist) dated December 31, 2002 (noting that
Theriot was treated between October 1, 1996 and April 15, 1997 for Major Depressive Disorder
which *at times* did affect her ability to work, but that he has not treated her since) [Adm. Rec.
166, 167]; Neurology Follow-Up Report of Dr. Wilensky dated May 15, 2002 (noting that

alcoholism without any difficulty in 1997 and that only occasionally ("every couple of months") would Theriot drink a beer (*i.e.*, "Red Dog," "the cheapest on the shelf").[87]

## B. Credibility

In addition to conflicts in the medical evidence, credibility determinations are peculiarly the province of the ALJ.[88]   The ALJ's assessment of the claimant's credibility is accorded great deference.[89]   Other than those non-exertional limitations found by the ALJ, the record lacks medical findings that corroborate any additional non-exertional limitations which significantly affected the claimant's residual functional capacity on or before December 31, 2001.  An ALJ has the discretion to evaluate credibility and to arrive at an independent judgment regarding pain as well as the duty to ultimately determine disability on the basis of the claimant's residual functional capacity to engage in gainful employment.

It is apparent to the Court that the ALJ did consider the claimed non-exertional limitations and determined that they were only slight and had a minimal effect on plaintiff's ability to work.   The ALJ made this determination in light of the plaintiff's statements made to and reported by her treating physicians.  ALJ Hertzig explained that the medical treatment records considered together with the plaintiff's own testimony does not support her complaints of

---

plaintiff has not seen a psychiatrist) [Adm. Rec. 206].

[87]*See* Transcript of Hearing [Adm. Rec. 269, 270].

[88]*See Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.1999).

[89]*See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002) (stating that the ALJ has the responsibility to resolve questions of credibility).

*debilitating* symptomotology on or before December 31, 2001.[90]

Plaintiff contends that the ALJ failed to sufficiently address all of the medical evidence and corroborate his credibility determination.   As previously mentioned, the issue at this level of review is whether substantial evidence supports the ALJ's rejection of Plaintiff's subjective complaints of *disabling* symptoms in light of the objective medical evidence, *inter alia.*

ALJ Hertzig acknowledged the plaintiff's subjective complaints and gave them some weight in making the determination, but found that Theriot was not precluded from performing her past relevant work.  Indeed, the ALJ incorporated non-exertional limitations of no climbing, no balancing and no exposure to heights and moving machinery.

This Court finds that there is substantial evidence to support the ALJ's conclusion that Theriot's allegations of disabling pain and deficits in concentration during the pertinent time frame were not substantiated by corroborative positive clinical findings, medical evidence and/or the plaintiff's own statements to her treating specialists.   The ALJ's assessment of plaintiff's credibility, which is reiterated hereinabove, comports with the legal standards outlined in Ruling 96-7p.  That ruling provides guidance as to the kinds of criteria the ALJ should assess in determining a plaintiff's credibility.  The ALJ reviewed plaintiff's daily activities, treatment protocols and functional limitations.  Additionally, the ALJ thoroughly explained the basis of his decision not to fully credit Theriot's testimony regarding alleged *disabling* mental and physical limitations.

---

[90]*See* Notes 49 and 50, *supra,* and accompanying text at pp. 10-12.  *See also* Notes 84 and 85, *supra*, and accompanying text at p. 25.

### C. Duty to Develop the Record/RFC Assessment

It is undisputed that the burden to prove disability in a social security case is on the claimant. Nevertheless, a social security disability hearing is nonadversarial, and the ALJ bears the responsibility to ensure that an adequate record is developed during the disability hearing consistent with the issues raised. Generally, the ALJ has a duty to develop the record by obtaining the pertinent, available medical records.[91] The ALJ has the power to subpoena such records if necessary.[92] If the ALJ does not have before him sufficient facts upon which to make an informed decision, his decision is not supported by substantial evidence.[93]

Here, the ALJ subpoenaed all of the plaintiff's medical/psychological treatment records dating back to December of 1996, notwithstanding the fact that plaintiff's earlier application for disability benefits was denied in July of 2001 and that decision was not appealed. Dr. Wilensky/neurologist and Dr. Rauchwerk/orthopedist were the only treating physicians who mentioned Theriot's depression/anxiety and it was by way of history. Indeed, as of the date of hearing, over five years had elapsed since plaintiff was treated by any mental health professional for either depression/anxiety or alcoholism. The ALJ fulfilled his duty to make a record which was sufficient for purposes of performing the requisite analysis.

---

[91]SSR 96-8p provides that the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure the file contains sufficient evidence to assess the RFC." SSR 96-8p

[92]20 C.F.R. §§ 404.950(d)(1), 416.1450(d)(1).

[93]See Harris v. Massanari, 2002 WL 10466 *3 (E. D. La.) (Vance, J.) (citing McGee v. Weinberger, 518 F.2d 330, 332 (5th Cir. 1975).

In this case, the ALJ's finding at step two of the sequential analysis was determined under the correct legal standard. The ALJ specifically referred to the *Stone* decision in his opinion and set forth the applicable standard as construed by the Fifth Circuit in *Stone, supra.*

The regulations provide that a residual functional capacity assessment (RFC) is "an assessment based upon all of the relevant evidence."[94]   The ALJ's RFC assessment comports with SSR 96-8p in that it contains a "thorough discussion of the objective medical evidence," and amply discusses how, "any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."[95]  "The RFC assessment is a function-by- function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."[96]  Inherent in every residual functional capacity assessment is a finding that the claimant can perform work on a regular and continuing basis, and thus can maintain employment.[97]  The Fifth Circuit considers these regulations and rulings to be relevant to any decision.[98]

The ALJ complied with the applicable regulations and Fifth Circuit jurisprudence. Plaintiff's medical/clinical evidence of mental impairment and/or functional work-related limitations within the relevant time period was slight to non-existent as previously discussed

---

[94]20 C.F.R.  § 404.1545(d).

[95]*Id.*

[96]*Id. (quoting* 61 Fed.Reg. 34474-01 (July 2, 1996)).

[97]*See* 20 C.F.R. S 404.1545(b); *see also Dunbar v. Barnhart*, 223 F. Supp. 2d 795, 802 (W. D. Tex.2002).

[98]*Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir.2001).

hereinabove.  The ALJ specifically so stated at the time of the hearing.[99]  The ALJ properly

assessed the severity of plaintiff's exertional and non-exertional impairments according to the

applicable legal standards.

## D.  Hypothetical Question

The Fifth Circuit has previously considered the question of the circumstances under

which a vocational expert's answer to a hypothetical question posed by an ALJ can provide

substantial evidence supporting the denial of benefits.[100]  In *Bowling v. Shalala*, 36 F.3d 431 (5th

Cir. 1994), the court enunciated a two-part standard for determining when a hypothetical

question constitutes reversible error, to wit:

> Unless the hypothetical question posed to the vocational expert by the ALJ can be
> said to incorporate all of the disabilities of the claimant recognized by the ALJ,
> and the claimant or his representative is afforded the opportunity to correct
> deficiencies in the ALJ's question by mentioning or suggesting to the vocational
> expert any purported defects in the hypothetical questions, a determination of non-
> disability based on such a defective question cannot stand.[101]

The hypothetical question posed by the ALJ incorporated all of the plaintiff's actual

limitations as established by the record during the pertinent time frame and accepted by the ALJ

as true.[102]  VE Meunier testified that the plaintiff could perform her prior work as sales manager

(as defined by the DOT), director of admissions and a sales person.   At the hearing, plaintiff's

---

[99]*See* Transcript of April 5, 2004 Hearing (noting "[t]his is a very sparse file, there's very
little [medical]) [Adm. Rec. 250].

[100]*Boyd v. Apfel,* 239 F.3d 698, 706-07 (5th Cir. 2001); *Bowling v. Shalala,* 36 F.3d 431,
436 (5th Cir. 1994).

[101]*Bowling,* 36 F.3d at 436.

[102]*See* Transcript [Adm. Rec. 271-274].

counsel specifically posed a hypothetical question incorporating plaintiff's non-exertional impairments (difficulty concentrating and intermittent severe back and neck pain) which would allegedly preclude work on a regular and continuing basis. However, the ALJ rejected plaintiff's claims of *disabling* back/neck pain and difficulty concentrating prior to December 31, 2001 and sufficiently explained his findings in this regard.

Fifth Circuit precedent holds that the ALJ's determination of what disabilities/limitations should be included in the hypothetical question is entitled to judicial deference as long as the disabilities included are supported by substantial evidence.[103]  This is one of those cases in which the ALJ relied on the findings of plaintiff's treating physicians.  Plaintiff's treating physicians/specialists (Drs. Adatto, Rauchwerk, Watermeier and Wilensky) either concluded or indicated their impression that plaintiff was not disabled and capable of performing her regular work  *during the pertinent time frame.*[104]

The Fifth Circuit's decision in *Leggett v. Chater*[105] supports the Commissioner's position and holds that, when assessing the credibility of a claimant's subjective symptomology, an ALJ may consider the fact that no examining physician pronounced the claimant disabled.[106] As in the case at bar, the *Leggett* court did not reach Step 5 of the analysis and ended its inquiry at Step

---

[103]*See Moore v. Sullivan,* 919 F.2d 901, 905 (5th Cir. 1990).

[104]*See* Neurology Follow-Up Report of Dr. Wilensky dated *April 15, 2003* (noting no significant head injury or loss of consciousness at the time of her first accident and that, only after the second accident (May 5, 2002) did she sustain head injury, vision problems, seizure disorder) [Adm. Rec. 203].  *See also* Notes 33, 34, 52, 54, 55, 58 and 61, *supra.*

[105]*Leggett,* 67 F.3d 558, 565 n. 12 (5th Cir. 1995).

[106]*Id.*

31

4, finding that sufficient evidence exists to support the Commissioner's finding that the plaintiff (Leggett) was capable of performing his past relevant work as a cashier as the position is generally performed in the national economy.  As in the *Leggett* case, substantial evidence discussed at length above supports the Commissioner's decision that Theriot was *not* disabled and was capable of performing her past relevant work as a director of admissions, a sales person and a sales manager (as performed in the national economy) through December 31, 2001.

### E.  Plaintiff's Failure to Demonstrate Prejudice

The Court now turns to the plaintiff's claim of reversible error in failing to reopen the case to admit evidence, *i.e.*, lay testimony of plaintiff's spouse and former spouse regarding Theriot's deficiency in concentration, depression and anxiety.  Even assuming *arguendo* that the ALJ's refusal to reopen the case to admit lay testimony did constitute error, the plaintiff has failed to demonstrate prejudice as required by Fifth Circuit jurisprudence.

Even at this juncture of the proceedings, plaintiff has not identified a mental health care professional who has treated her either during the pertinent time frame or thereafter.   Instead, plaintiff argues that it was error not to reopen the case to admit the *lay* testimony regarding her mental state.

As aforestated, the case law teaches that reversals based upon a failure to develop the record require a showing of prejudice.[107]   At the outset, the Court observes that this case is nothing like the inadequate inquiry line of cases, typified by *Kane v. Heckler*, 731 F.2d 1216 (5th Cir. 1984), wherein the ALJ conducted a five-minute hearing transcribed in four pages and asked a single question of a *pro se* claimant.  In the case at bar, ALJ Hertzig thoroughly questioned

---

[107]*Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984).

Theriot <u>and</u> allowed plaintiff's counsel to pose questions to the plaintiff and to the VE on

plaintiff's behalf, fulfilling the inquisitorial function.  The administrative hearing addressed

Theriot's alleged physical/mental conditions, symptoms, educational background, work

experience, responsibilities, daily activities and how plaintiff's symptoms affected her ability to

function in daily life.[108]

The ALJ's questioning on all of the aforesaid topics, together with the Administrative

Record as it is presently constituted, are sufficient to satisfy the duty imposed by *Kane, supra*.[109]

ALJ Hertzig fulfilled his duty to develop the relevant facts so that he could fully and fairly

evaluate Theriot's claim for disability insurance benefits.[110]  Plaintiff's counsel clearly indicated

at the close of the hearing that he had no additional evidence, to wit: "Thank you.  That's all I

have, Your Honor."[111]  Most notably, the post-hearing testimonial evidence plaintiff sought to

introduce is cumulative of plaintiff's testimony and other evidence of record considered by the

ALJ.[112]  Because the aforesaid lay testimonial evidence is *merely cumulative* of other evidence in

---

[108]*See* Transcript of the April 5, 2004 Administrative Hearing before ALJ Hertzig  [Adm. Rec. 244-276].

[109]*See Brock v. Chater,* 84 F.3d 726, 728 (5th Cir. 1996); *Carrier v. Sullivan,* 944 F.2d 243, 245 (5th Cir. 1991); *James v. Bowen,* 793 F.2d 702, 704-05 (5th Cir. 1986) (distinguishing *Kane v. Heckler,* 732 F.2d 1216 (5th Cir. 1984)).

[110]*See* Transcript of the Administrative Proceedings conducted on April 5, 2004 (inquiring of plaintiff's counsel regarding the existence of any additional medical records (in particular mental health treatment records), admitting additional medical evidence submitted pursuant to the hearing albeit duplicative of evidence already in the record, allowing counsel to question VE Meunier and to submit additional evidence) [Adm. Rec. 246-253, 274-276].

[111]*Id.* [Adm. Rec. 276].

[112]*See* Kenneth Theriot, Sr.'s Correspondence dated July 22, 2002 (describing plaintiff's "difficulty concentrating," "persistent confusion," "lapses in consciousness," "vision problems" and "unsteady gait") [Adm. Rec. 155].

the record, plaintiff cannot now demonstrate prejudice.

## V. CONCLUSION

This Court's function on appeal is limited to a determination of whether the ALJ's findings are supported by substantial evidence. Substantial evidence of record, considered in light of the applicable legal standards, supports the Commissioner's decision that Theriot is not disabled within the meaning of the Act.   Accordingly,

**IT IS RECOMMENDED** that the plaintiff's Motion for Summary Judgment be DENIED, the Commissioner's Cross-Motion for Summary Judgment be GRANTED for the foregoing reasons and that the plaintiff's case be DISMISSED WITH PREJUDICE.

## NOTICE OF RIGHT TO OBJECT

Objections must be: (1) specific, (2) in writing, and (3) served within ten days after being served with a copy of this report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b) and 72(b) A party's failure to object bars that party from: (1) entitlement to *de novo* review by a district judge; and (2) appellate review of the un-objected-to factual findings and legal conclusions accepted by the district court, except upon grounds of plain error. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 24 day of March, 2006.


**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

34